KENTUCKY & INDIANA TERMINAL RAILROAD CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28081.   Promulgated May 16, 1930.

*Edward P. Humphrey, Esq.*, for the petitioner.
*E. C. Algire, Esq.*, for the respondent.

974

OPINION.

TRAMMELL: The deficiency involved in this proceeding results from the action of the respondent in including in the petitioner's income for the taxable year 1923 the sum of $243,727.92 as having been received in the settlement effected in said year between the petitioner and the Director General of Railroads under the circumstances detailed in our findings of fact, above.

The petitioner makes three contentions—first, that it *received* absolutely nothing as a result of the settlement of its accounts and claims with the Director General in 1923, but, on the contrary, *parted* with $50,000, which it paid to the Director General in the final settlement; second, that if it did receive anything from the settlement in said year, it was not income; and, third, if it received income, it should be allocated to the prior years comprising the period of Federal control and could not be regarded as income for the taxable year. We will consider these contentions of the petitioner in the order stated.

The petitioner's position on the first point is, in our opinion, untenable. The fact that the petitioner paid $50,000 to the Director General in compromise and settlement of the accounts between them is not conclusive evidence, or indeed persuasive evidence, that the petitioner received nothing thereby. An analysis of the facts leads us to the contrary conclusion.

Prior to the conference at which the final agreement was reached, petitioner had filed a claim with the Director General showing a net balance due it of $148,160.72, which claim included, among numerous other items, a credit of $50,000 representing the amount advanced in cash by the Director General to the petitioner for a working fund.

The Director General contended that the petitioner was indebted to him in the net amount of $347,892.94, which included the $50,000 working fund advanced. That the petitioner had received this money and was indebted to the Director General therefor was not disputed or questioned by any one. Of the remaining items asserted by each party against the other, some were in controversy and some were not. Several conferences had theretofore been held, which demonstrated the inability of the parties to reach a settlement on the basis of agreement on individual items. In the final conference the whole matter was compromised and settled by the petitioner paying to the Director General $50,000. Thus, the effect of the lump settlement was that the petitioner paid to the Director General an amount

equal to that advanced to it for the working fund, and the claim of each party against the other for additional amounts due was abandoned.

In what position did this final settlement leave the petitioner in relation to its net worth at the beginning and end of Federal control? We will attempt to notice only certain salient facts, which we deem sufficient for decision of the issue in this proceeding.

During the period of Federal control the Director General made additions and betterments to the petitioner's properties, which petitioner conceded and for which it credited the Director General on its books in the amount of $348,056.92. In its final claim, the petitioner showed as due from it to the Director General for additions and betterments the amount of $382,391.60. While there was some controversy regarding the exact amount, the evidence clearly establishes that the additions and betterments so made by the Director General were of very substantial value, and the petitioner acquired an unencumbered title to this property as a direct benefit flowing from its final settlement with the Director General.

Again, it is apparent that, by the payment of $50,000 and the cancellation of its claim against the Director General in the amount of $148,160.72, the petitioner settled the larger claim of the Director General against it in the amount of $374,892.94.

In the light of these facts, we can not conclude that the petitioner received nothing as a result of its final settlement with the Director General. It did in fact receive property having an admitted value of not less than $382,000.

The next question is, did this property constitute income to the petitioner in whole or in part. To answer this question, we must examine the evidence to determine, if we can, what the petitioner paid for the assets so acquired.

In the claim filed by the petitioner with the Director General appeared the debit item, " Bridge Tolls, $231,178.99." There further appeared in said claim under miscellaneous items due to and from the corporation two items of " Interest other than Rental Interest " showing a balance due to the corporation on this account of $1,711.93, and also as due to the corporation " Rental Interest on Completed A & B," $16,422.32. All of these items were disputed by the Director General, and in the final lump-sum settlement no specific items theretofore in controversy were formally conceded by either party. However, we can not indulge in the assumption that the petitioner received the assets acquired in this transaction as a donation or gift from the Director General. It must have paid something or surrendered some valuable right therefor.

The discrepancy in the accounts could be rectified if we knew what disputed items on the petitioner's claim were finally conceded by the Director General, if such be a fact. And that there was a

concession on the part of the Director General is self-evident. The problem is to determine, if possible, what items were most probably taken into consideration by the Director General in reaching the final agreement.

In any event, it is certain that as a result of the agreement reached, the petitioner voluntarily canceled its claim to the bridge tolls in the amount of $231,178.99 and the two items of interest in the amount of $1,711.93 and $16,422.32, respectively, and in lieu thereof it received the additions and betterments made by the Director General.

The respondent has included as taxable income the entire amount of the bridge tolls, also the entire amount of the first interest item of $1,711.93, and of the second interest item, $10,837. The petitioner recorded on its books as a " Credit Resulting from Settlement of Claim against U. S. Govt.," $255,608.17, of which the respondent determined, as before stated, that $243,727.92 represented taxable income, consisting of the items of bridge tolls and interest above referred to.

Just what items of the petitioner's claim theretofore in controversy the Director General conceded or took into consideration in reaching the final settlement agreed on, we have no direct evidence to show, but in our opinion no item on the petitioner's claim was entitled to preferment over the three selected by the respondent.

Only nine of the items on the petitioner's claim against the Director General were in controversy, including the bridge tolls and three items of interest. The remaining five disputed items were, " Rents—Company Houses," $323.24; " Expenses incurred account operation double unit shop," $38,919.73; " Material and Supplies," $28,604.94; " Undermaintenance of Way and Structures," $129,041.02, and " Undermaintenance of Equipment," $17,146.74. Three of the latter five items were not only of doubtful merit, but were insufficient in amount to be regarded as material factors in the final settlement reached between the parties. This leaves only the two items of undermaintenance in the aggregate amount of $146,187.76. The petitioner contended that its properties had been undermaintained to this extent, while the Director General contended that the properties had been overmaintained.

Considering the amounts and comparative merits of the disputed items, the circumstances attending the final settlement and the results effected, it seems not unreasonable to conclude that the Director General concurred in the final settlement on the basis of conceding the petitioner's claim to the bridge tolls and items of interest. Certainly from the evidence we can not say that such allocation made by the respondent has affirmatively been shown to be erroneous.

In *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135, where we had a similar situation before us, we said:

We come next to consider the questions which arise out of the settlement made with the Director General of Railroads for the period of Federal control. * * * On March 1, 1920, the railroad properties were surrendered and turned back to their owners. Thereafter negotiations were entered upon to settle the accounts between petitioner and its affiliated companies and the Director General of Railroads. Each claimed that upon such settlement the other was indebted. The nature of several items of the claim was such that there could be no exact measurement. The negotiations terminated in an understanding that each should waive any claim upon the other. * * *

The settlement which was reached between these parties involved the consideration of the several claims going to make up the total. Some of these claims affected the computation of the income of the railroad and others affected only capital accounts. * * *

  *     *     *     *     *     *     *

It is the contention of the petitioner that in the allocation of the settlement, insufficient amounts have been attributed by the Commissioner to * * * capital items * * * and that excessive amounts have been attributed to items of undermaintenance and materials and supplies. The evidence submitted to us indicates that the claim of the petitioner for undermaintenance of its properties rested upon a much better basis than its claim with respect to such capital items. While these latter claims were not without merit, we believe that the evidence fails to establish that any error was committed in preferring the claim for undermaintenance over such other claims.

In the instant case, the respondent contends that the consideration which moved the Director General to agree to the compromise settlement had with the petitioner was his final recognition of the petitioner's right to the bridge tolls collected by the Director General and the interest claimed by the petitioner on additions and betterments and equipment paid for by it. On that basis, the net result of the settlement would be that the petitioner in effect received the bridge tolls and interest and paid the amounts back to the Director General in consideration of the assets transferred to it. This was not done in form; the parties cut corners in balancing their accounts, but the same net result was in fact achieved. Under the evidence before us, we can not say that the respondent's conclusion is erroneous. It must follow that the amounts so determined by the respondent constitute income to the petitioner.

However, if the record does not affirmatively justify the conclusion stated, we must nevertheless approve the determination of the respondent that the amounts in question constitute income, for the reason that the burden is upon the petitioner to show by a preponderance of the evidence that said amounts were in fact not income, and this it has wholly failed to do.

There remains for consideration the third point raised by the petitioner, namely, that if it did receive income as determined by the

respondent, such income should be allocated to the period of Federal control and is not income for the taxable year.

The petitioner kept its books by the accrual method, and contends that any income realized from the final settlement with the Director General accrued in the years of Federal control prior to the taxable year.

In determining whether an item has accrued, it is immaterial whether such item represents expense or income. The same general principles are applicable. *Sanford & Brooks Co.*, 11 B. T. A. 452. Income, like expense, will accrue when all events have occurred which fix both the amount and the liability to pay. *United States* v. *Anderson*, 269 U. S. 422, 441.

While the amount of the bridge tolls here in question was definitely known prior to the taxable year, the petitioner's right thereto was not conceded by the Director General, nor were the tolls even claimed by the petitioner. The Director General claimed such money as property of the United States and denied any liability to pay the same to the petitioner, at least prior to the settlement in 1923. Also, the evidence does not show that prior to 1923 the petitioner asserted any claim to the tolls. The first claim filed by the petitioner against the Director General did not set up this item, and it was not accrued or entered on the petitioner's books. The petitioner alleges in its brief, substantially, that the item was not accrued on its books through oversight, and argues that mere matters of bookkeeping can not control facts.

While it may be true that if the amount in question did accrue to the petitioner in the years prior to 1923, the fact that it was not entered on the books would not prevent its being income for such years; nevertheless, the fact that it was not formally entered on the books may be considered in determining the attitude or intention of the petitioner in that connection. And we can not agree with the statement of the petitioner in its brief that the failure to enter on the books resulted from oversight. On this point the witness Scott, formerly chief clerk and auditor of the petitioner, testified:

Q. Was the item or the amount of $231,178.99 representing bridge tolls, entered on the books of the petitioner during the years 1918, 1919 and two months of 1920?

A. No.

Q. Was it ever entered on the books of the petitioner prior to the final settlement with the Director General?

A. It was not entered for the reason that we did not know what the outcome of the transaction was going to be.

The facts of this case distinguish it from our decision in *Southeastern Express Co.*, 19 B. T. A. 490, and bring it within the scope of our decision in *Lehigh & Hudson River Railway Co.*, 13 B. T. A.

1154; affd., 38 Fed. (2d) 1015. In this latter case we said, at page 1168:

The respondent points out that the contract of March 26, 1919, in section 9 (b), made specific provision for the payment for any shortage in materials and supplies at the time the property was returned at prices prevailing at the end of Federal control; the shortage was known in 1920, and the prices were known; and a mathematical computation would have determined the amount due from the Director General, which computation was acutally made on the books of the Director General as of December 31, 1920. Conceding the correctness of all of these facts, nevertheless the parties were in substantial disagreement in regard to this item and the respondent has failed to show that in 1920 the petitioner knew that it would get at least $234,841.58 on account of the shortage, and we cannot say as a matter of law under all of the facts in this case that this amount should have been accrued at that time.

The deficiency determined herein by the respondent is approved.

*Judgment will be entered for the respondent.*